IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No.  05-cv-00711-LTB-MJW

MARLYS RATHBUN and LEROY RATHBUN, on behalf of themselves and all those similarly situated,

Plaintiffs,

v.

QWEST COMMUNICATIONS INTERNATIONAL, INC., and
THE QWEST TELEPHONE CONCESSION PLAN,

Defendants,

v.

COMMUNICATIONS WORKERS OF AMERICA, ASSOCIATION OF US WEST
RETIREES, and MARY M. HULL,

Intervenor Defendants.

_____

MEMORANDUM OPINION AND ORDER
_____

Babcock, C.J.

The defendant Qwest Communications International, Inc. ("Qwest") provided for

employees and retirees discounted and free telecommunications services to those who resided

within the geographic area in which it operates and reimbursements to those who lived without.

Qwest terminated the reimbursement portion of this program, termed the "Employee

Discount/Automatic Payment Plan" ("Program"), on January 1, 2004.

The parties here offer competing expressions of the issue presented.  Qwest would frame

the issue thus: does a telecommunications company that offers to its employees and retirees

discounted or free telephone services as an inducement to consume those services subject itself to the strictures of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA") when, in the interest of parity, it provides a reimbursement to those employees and retirees who reside outside its service area?  The plaintiff, Marlys Rathbun, would have the question thus: does a system of taxable reimbursements of telephone expenses made by a telecommunications company to certain retirees constitute a plan governed by ERISA?

The questions are not redundant.  It is dispositive of Ms. Rathbun's claims whether Qwest established a plan for supplying retirement income to Ms. Rathbun and the class she purports to represent or rather supplied discounted and free telephone service to its employees and retirees. Ms. Rathbun moves for certification of the putative class.  She and Qwest have filed cross motions for summary judgment on the question whether the Program as it existed prior to January 1, 2004 constituted an ERISA pension plan.  Qwest moves for summary judgment dismissing the claims of spouses of its retirees, including the plaintiff Leroy Rathbun, on the ground that spouses are not beneficiaries of the Program.  Finally, Ms. Rathbun moves to strike certain evidence proffered by Qwest on the question whether spouses are beneficiaries.

The motions are adequately briefed and oral argument would not materially aid their resolution.  The material facts are undisputed and only their legal significance remains to be determined.  For the reasons stated below, I find that Ms. Rathbun is not representative of the putative class and I conclude that the Program cannot be construed to be an ERISA plan; the facts do not admit of the analysis Ms. Rathbun proposes.  Thus, I DENY Ms. Rathbun's motion for class certification, DENY her motion for partial summary judgment, GRANT Qwest's motion for summary judgment on the ground that the Program is not as ERISA plan, and DENY AS

MOOT all other motions.

## I.  Facts

### A.      History of the Program

Qwest attained its perch atop the regional telecommunications market by virtue of a July, 2000 merger with US West Communications ("US West").  US West had obtained regional remnants, located within the western and northwestern United States, of the American Telephone and Telegraph Company ("AT&T"), of which a court in 1982 had ordered partition.  US West treated these former AT&T subsidiaries – Mountain Bell Telephone Company, Northwestern Bell Telephone Company, and Pacific Northwest Bell – as regional components – the Central Region, Eastern Region, and the Western Region, respectively – of its operation.

After the divestiture of AT&T was accomplished on January 1, 1984, AT&T continued to provide long-distance service between area codes, known in the industry as Local Access and Transport Areas, or LATAs.  Regional carriers, such as US West, provided local and intraLATA long distance service – service between points contained within the same area code.

AT&T had, at least as early as July, 1963, provided to its employees and retirees a concession consisting of free and discounted telephone services.  A July 1, 1963 manual explained,

> In order to provide the best possible service to the public, the Company believes it should be able to call its employees when necessary.  At times it may be necessary for employees to call their supervisors regarding work assignments or job attendance.  To this end and to encourage employee subscription to telephone service, the Company offers local service to employees on the following basis:
> (a) Fifty percent concession to employees with less than 30 years service.
> (b) One hundred percent concession when it is in the best interest of the Company from an operating standpoint.

Certain management personnel, employees with 30 or more years of service, and pensioned retirees received a concession of one hundred percent of their local telephone expenses and a "reasonable amount" of long distance services.  To those active and retired employees who lived in rural locations where AT&T did not provide local telephone service, AT&T reimbursed the costs of purchasing service from local carriers.

In compliance with the terms of the court-ordered divestiture, US West, by a series of agreements with AT&T, bound itself to adopt AT&T's concession program.  As AT&T had done, US West provided for its employees and retirees (and pre-divestiture retirees of the former Mountain Bell, Northwestern Bell, and Pacific Northwest Bell entities) discounted and free local and intraLATA service.  Because US West did not at first sell interLATA service to customers, it did not concede such service to its employees.

US West (and later, Qwest) found the telephone concession effective in encouraging its employees and retirees to use, become familiar with, and extol its services.  In the words of Jill Sanford, formerly Qwest's chief human resources officer, Qwest wanted its employees and retirees "to be out there in the market as ambassadors of Qwest, touting the products, how great they are, as users of the products... ."  In the interest of treating its employees and retirees consistently and equitably, US West also continued AT&T's practice of reimbursing to those employees and retirees living in areas where it did not provide service part or all of the costs of obtaining such service from independent carriers.  Though these theoretically antithetical goals – ambassadorship and parity – eventually proved contradictory in practice, the concession descended substantially unchanged from AT&T's concession plan.

As US West in ensuing years consolidated its operation, it revised disparate provisions of

the regional concessions to make a unitary Program.  After May, 1989, a single office located in

Omaha, Nebraska administered the Program.  This became known as the Omaha Telephone

Concession Service Group, or OTC.  (It is now called the Auto Pay Center.)  Amendments to the

Program in 1990 reconciled regional and intramural differences in eligibility requirements and tax

treatment and produced other changes, described below.

      **B.**      **Provisions of the Program before December, 2003**

      US West's Regional Policy and Procedures ("RPP") number 1207 governs the Program.

After January 1, 1990, and before the December, 2003 amendment here complained of, US West

stopped providing reimbursements to active employees who resided, and retirees who moved,

outside its service area.  However, it continued to provide reimbursements for those who had

retired outside its coverage area prior to 1990 and had not since moved, and for all out-of-area,

pre-divestiture retirees.  In these and other matters, the versions of RPP 1207 in effect prior to

December, 2003 differentiated among various classes of employees and retirees.

      Section 1 of RPP 1207 governed administration of the concession for active employees

and resembled AT&T's prior manual in its essential terms.  Those employees residing within an

area that US West served received a fifty per cent discount on their local and intraLATA

telephone services beginning on their first day of employment.  Upon the thirtieth anniversary of

their employment, their concession increased to one hundred per cent.  These benefits continued

to an employee's household for two months after his death, unless his employment was first

terminated.

      Section 2 regulated the benefit for employees retired on or after January 1, 1999.  Former

employees who retired on a service or disability pension were eligible for the Program.  Among

those not eligible were: former employees receiving a "deferred vested pension," recipients of long term disability benefits not receiving a pension, and employees retired after January 1, 1999 who resided in exchanges that US West/Qwest did not serve.  The benefit consisted of free local and intraLATA service.  The benefit ceased for retirees who moved out of US West/Qwest's service area, and recommenced if they returned.  The benefit continued for two months after a retiree's demise.

Section 3 of RPP 1207 governed the benefit afforded to employees who retired between January 1, 1990 and December 31, 1998.  Eligibility requirements were consonant with those for later retirees, as were the demarcations of the benefit.  Unlike later retirees, retirees designated in Section 3 were entitled to receive reimbursement of expenses paid to service providers other than US West/Qwest upon the conditions, *inter alia*, that they had received the services before a certain date – January 1, 1990 or January 1, 1984, depending upon the retiree's location – and had since remained at the same premises.

Those who retired between 1984 and 1989 were also subject to various risks of abdication, explained in Section 4 of RPP 1207, which depended upon their geographic region.  Those who retired before 1984, identified in Section 5 of RPP 1207, were permitted to relocate without surrendering their reimbursement rights.  Other portions of RPP 1207 regulated Program benefits for honoraries, advisors, and officers who had served on AT&T's Board of Directors prior to divestiture and for active and retired management employees.

All retirees eligible for reimbursement were required to pay the full amount of charges from the company providing telephone service, then to submit the billing statement to the OTC.  Reimbursements were included with the retiree's monthly pension check.  Unlike the pension

plans Qwest established for its retirees, the Program had no discrete fund.  Instead, reimbursements made under the Program were paid out of Qwest's operating expenses.

A change in the status of an employee resulted in that person coming under a different provision of RPP 1207.  Qwest published a form to commemorate such occasions.  The accompanying instructions advised,

> The form should be issued when an employee:
>> Begins employment with Qwest (new-hire)
>> Re-establishes the employee discount (e.g., transferred from Eastern to Central region)
>> Attains 30 years
>> Retires
>> Is no longer eligible (e.g., transferred to a deregulated subsidiary or moves to an independent company)
>> Terminates employment
>> Is deceased

As technology evolved, so did the Program.  Later iterations included products such as custom rings, caller identification, and voice messaging.  Employees and retirees were eventually eligible for discounted internet, wireless telephone, and interLATA services.

US West and Qwest published letters, notices, and other documents setting forth the terms and conditions of the Program and confronting issues that arose during its administration.  Some of these mentioned the Program in its entirety, while others considered only segments, such as concessions to retirees, to active employees, or to retirees who had retired during a particular interval.  These documents used various descriptors for the Program and parts of it, including "concession," "telephone concession," "employee concession," "pensioner concession plan," "retirement concession," "employee discount," "employee discount plan," "employee telephone concession plan," and "Qwest discount plan."

A notice from Qwest to retirees after the merger with US West explained, "Qwest is now the provider of your Employee Discount benefits (formerly referred to as telephone concession benefits)."  Enclosed were envelopes pre-addressed to Qwest's "Pensioner Employee Discount Office."  The notice promised, "Your Employee Discount reimbursement is included in your pension check."

## C.     Tax issues

Fringe benefits are taxable as income unless excluded under the varied rules of the Internal Revenue Service ("IRS").  Qwest's concession of free services is excluded; a discount on service sold to customers in the ordinary course of business for which an employer incurs no substantial additional cost is not taxable when offered to current and former employees.  Cash substitutes for no-additional-cost service, such as the reimbursements made under the Program, are generally not excluded from taxable income.  However, Congress has made an exception for local-service reimbursements to those who retired from AT&T entities before divestiture.

These rules resulted in a complex matrix of inconsistent tax treatments for various beneficiaries of the Program, as Qwest administered it prior to January, 2004.  For employees and retirees residing within Qwest's service area, the concession was non-taxable.  For pre-divestiture, out-of-area retirees, the local service concession was non-taxable and the toll service concession was taxable.  For post-divestiture, out-of-area retirees and active employees receiving reimbursements, the concession was taxable.

## D.     Ms. Rathbun's concession

Ms. Rathbun began working for Mountain Bell Telephone Company in 1969.  After a short break, she returned to work for Mountain Bell in 1970 and continued in her employment

until retiring on June 6, 2001.  When she began her employment, she received free or discounted (she cannot recall which) local telephone service from Mountain Bell.  In 1985, she and her husband moved to a rural area of Montana, outside Mountain Bell's service area.  Thereafter, she purchased local service from Mid-Rivers Telecommunications, a local vender, and US West reimbursed 50 percent of that expense.  She understood that her union, the International Brotherhood of Electrical Workers, periodically negotiated for her and her fellow employees in Montana the continuation of this benefit.

In November, 2000, Ms. Rathbun attained thirty years of service with Qwest and its predecessors.  Qwest then began to reimburse 100 percent of her local and intraLATA telephone expenses.  Upon retiring, Ms. Rathbun took a lump-sum payment in lieu of a monthly pension disbursement.  Thereafter, she received from Qwest only her Program reimbursements, which continued at the same rate as before.  In 2003, Qwest reimbursed to Ms. Rathbun $739.90 in telephone expenses.

### E.      December, 2003 Amendment of the Program

Late in 2003, Qwest resolved to encourage more employees and retirees to use its services, some of which it had made available outside its local service areas.  It also determined that subsidizing other telecommunications companies was an unsound business practice.  For these reasons, it decided to amend the Program by, among other alterations, terminating reimbursements.

In a memorandum to occupational employees, Jill Sanford, Qwest's Vice President for Compensation and Benefits announced,

At Qwest, we rely on our 47,000 employees to be ambassadors for our business.  As part

9

of our Spirit of Service commitment and to help you become familiar with all of our Qwest products and services, we will be expanding our Qwest Discount Plan.

Early next year, we will enhance the plan to include many products and services currently offered to customers, including local service, DSL, wireless, long-distance and video.

The memorandum also declaimed,

Employees living outside a Qwest local service area who are currently being reimbursed for another carrier's service will no longer receive reimbursement for that service effective January 1, 2004. You will have until January 31, 2004 to submit your bills under the current process. Requests for reimbursement received after that date will not be processed.

The union [Communications Workers of America ("CWA")] negotiated the expansion of the Qwest Discount Plan and the company and the union were able to agree on the vast majority of the changes. However, the company and the union were not able to come to an agreement with respect to the changes described above for employees living outside the Qwest local service area.

At approximately the same time, Qwest sent letters to out-of-area employees and retirees announcing its decision to terminate the reimbursement portion of the Program. A December 9, 2003 letter authored by Barry Allen, Qwest's Executive Vice President and Chief Human Resources Officer, explained that recipients could receive discounted Qwest long-distance service and could receive discounted local services by moving to an area that Qwest served.

## II. Procedural history

Two class action lawsuits followed Qwest's termination of the reimbursements. The first, filed in Colorado state court by Wesley Colvin and the Association of US West Retirees ("AUSWR") on behalf of all retirees whose reimbursements had ended, resulted in a settlement. Mr. Colvin and the AUSWR took pains in that case to characterize Qwest's conduct as a breach of contract rather than a violation of ERISA. After settling its claims with Qwest, the AUSWR amended the complaint to include, in order directly to compromise, an ERISA claim.

Ms. Rathbun, after declining to participate in the settlement of the *Colvin* suit, commenced

this action in the United States District Court for the District of Arizona.  The case was

transferred here.  In her original complaint, Ms. Rathbun defined the putative class as all persons

falling into one of two categories:

> 1) Retirees of Qwest (or a predecessor) who were entitled to receive the Telephone
> Concession benefit as the benefit was administered by Qwest through December 2003; and
> 2) Current employees of Qwest who have lived outside the service area of Qwest (or a
> predecessor) since January 1, 1990, and who were entitled to receive the Telephone
> Concession Benefit as the benefit was administered by Qwest through December 2003,
> and who have not changed their residence since December 2003.

Class Action Complaint ¶ 37.  I later permitted Ms. Rathbun to consolidate this action with one

filed by her husband, then stayed Mr. Rathbun's claims until resolution of the present motions.

The AUSWR, which represents numerous retirees who receive or received the concession,

and Mary M. Hull, its President, moved for leave to intervene here for the purpose of contesting

class certification.  I granted their motion.  The CWA also intervened.  The AUSWR, and Ms.

Hull expressed their concern that a ruling in this case that the Program is governed by ERISA

would make the concession taxable for employees and retirees who have not paid taxes on it.

The Rathbuns then amended their complaint, narrowing the definitions of both the alleged

plan and the putative class.  In the Amended Complaint, the term

> Telephone Concession Plan refers to the Retiree Telephone Concession benefits that
> Qwest informed Out-of-Service Area Post-Divestiture Employees that they would receive
> upon retirement or that Qwest actually provided to Out-of-Service Area Post-Divestiture
> Retirees, together with the administrative scheme and source of payment used to deliver
> that benefit.  As used in this [Amended] Complaint, the Plan does not refer to any
> Telephone Concession conferred on active employees while they were actively employed
> or In-Service Area Employees.

Consolidated Amended Class Action Complaint ¶ 24.  The new putative class consists of persons

falling into one of two categories:

> (1) Retirees of Qwest or U.S. West as of December 2003 (and spouses of those retirees) who (a) retired on or after January 1, 1984, (b) were eligible to receive the Telephone Concession as the benefit was administered (as defined by the RPP No. 1207) as of December 2003, and © resided outside the Qwest Service Area as of December 2003; or

> (2) Persons employed by Qwest as of December 2003 (and spouses of such employees) who (a) have lived outside the Qwest Service Area since January 1, 1990, and were eligible to receive the Telephone Concession upon retirement as the benefit was administered (as defined by the RPP No. 1207) as of December 2003 and © have not changed their residence since December 2003.

*Id*. at ¶ 44. Explicitly excluded from the class are all persons not excluded from the *Colvin* class, Qwest's officers and directors, and fiduciaries of the alleged plan.

## III.  Class certification

In order to certify a class, a putative class representative must satisfy the four pre-requisites of Rule 23(a) of the Federal Rules of Civil Procedure and must establish that the case fits into one of the three subcategories of Rule 23(b).  *Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 183 F.R.D. 687, 690-691 (D. Colo. 1998); *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 578 (D. Colo. 2002).  Rule 23(a) states,

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Qwest and the CWA oppose certification on the grounds that the Rathbuns here assert claims antithetical to the interests of other employees and retirees and thus fail to satisfy the typicality and adequate representation requirements of Rule 23(a).  CWA points out that the

proposed class includes current employees, whom it represents in labor negotiations with Qwest. Pursuant to CWA's most recent agreement with Qwest, out-of-area employees, though ineligible for reimbursements on local and intraLATA service, are nevertheless eligible for discounts on other Qwest services, such as long distance and DSL. These benefits will continue into retirement and are currently non-taxable. Annie Hill, the CWA's Vice President, avers that the "CWA and its members strongly prefer that upon their retirement these union employees receive the nontaxable Concession discounts that CWA has negotiated on their behalf... rather than taxable pension plan distributions." Declaration of Annie Hill ¶ 5.

The concerns expressed in CWA's opposition and in the AUSWR's previous motion to intervene raise doubts whether Ms. Rathbun's claims are typical of the claims of the class and whether she and Mr. Rathbun will adequately represent the interests of the putative class. I am particularly concerned with the adequacy of representation. "It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent." *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10th Cir. 1974). "And this requirement of adequate representation must be stringently applied because members of the class are bound unless they affirmatively exercise their option to be excluded, even though they may not be actually aware of the proceedings." *Id*. at 463-464.

Though the Rathbuns, the AUSWR, and the CWA share an interest in obtaining the most extensive Program benefits possible for employees and retirees, the means to obtain those benefits matter as much as the end. I find instructive that the AUSWR in the *Colvin* litigation pursued contractual theories against Qwest and not ERISA claims. Also, the concerns stated here by Ms. Hill and the CWA raise the specter of Qwest employees, whom Ms. Rathbun purports to

represent, bearing adverse tax consequences as a result of any success that Ms. Rathbun attains in this case. *Block v. First Blood Associates*, 691 F. Supp. 685, 695 (S.D.N.Y. 1988); *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1433 (S.D.N.Y. 1985). *See also*, *Masri v. Wakefield*, 106 F.R.D. 322, 326 (D. Colo. 1984). Further, the relief Ms. Rathbun seeks, which includes reformation of the Program to comply with ERISA, may not accrue to the advantage of putative class members, who desire the freedom to negotiate with Qwest through the CWA. *Id.*

The specter of the Rathbuns' conflict with the interests of putative class members is too great. Therefore, their motion for class certification must be denied. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338-339 (4th Cir. 1998); *Bailey v. Ryan Stevedoring Co.*, 528 F.2d 551, 553-554 (5th Cir. 1976); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1191 (11th Cir. 2003); *Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974), *cert. denied*, 419 U.S. 996, 95 S. Ct. 309, 42 L. Ed. 2d 269 (1974).

**IV.  Summary judgment**

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). I shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Because no genuine issues of material fact appear here, all that remains is to determine which, if either, party is entitled to judgment as a matter of law on the question of ERISA coverage.

29 U.S.C. § 1002(3) defines an employee benefit plan, covered by ERISA, as "an employee welfare benefit or an employee pension benefit plan or a plan which is both an employee

14

welfare benefit plan and an employee pension benefit plan." Ms. Rathbun does not contend that

the Program constitutes an employee welfare benefit plan, only that it is a pension plan. A

pension plan governed by ERISA is

> any plan, fund, or program which was heretofore or is hereafter established or maintained
> by an employer or by an employee organization, or by both, to the extent that by its
> express terms or as a result of surrounding circumstances such plan, fund, or program –
>> (I) provides retirement income to employees, or
>> (ii) results in a deferral of income by employees for periods extending to the
>> termination of covered employment or beyond,
> regardless of the method of calculating the contributions made to the plan, the method of
> calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).

Despite Ms. Rathbun's attempts, the Program reimbursements cannot be characterized as

deferred income because employees and retirees have no entitlement to any funds until they have

expended the reimbursable amount on telephone services. The Program does not result in the

systematic deferral until retirement of income earned during employment. *McKinsey v. Sentry*

*Ins.*, 986 F.2d 401, 406 (10th Cir. 1993). Therefore, the operative question is whether the

reimbursements constitute "retirement income" within the meaning of ERISA.

ERISA does not define the term "retirement income." Higher courts have provided

guidance. The term is

> not to be read as an elastic girdle that can be stretched to cover any content that can
> conceivably fit within its reach. Any outright conveyance of property to an employee
> might result in some payment to him after retirement. The words "provides retirement
> income" patently refer only to plans designed for the purpose of paying retirement income
> whether as a result of their express terms or surrounding circumstances. ... Under the
> statutory definition, therefore, the mere fact that some payments under a plan may be
> made after an employee has retired or left the company does not result in ERISA
> coverage.

*Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) (*quoted in McKinsey*, 986 F.2d at

405.).  *See also*, *Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 189 (3d Cir. 2003); *Williams v. Wright*, 927 F.2d 1540, 1546-1547 (11th Cir. 1991).

Ms. Rathbun does not dispute that the primary purpose of the Program was to make commercial ambassadors out of US West and Qwest employees and retirees.  And as she expressly concedes, Qwest's objective in extending Program benefits to persons in her circumstance was "to make the same benefits available to both in-service and out-of-service retirees."  Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, 5.  Also, that Ms. Rathbun and other tenured employees received the reimbursement before and after retirement belies any suggestion that the Program was designed for the purpose of paying retirement income.

Courts examining programs by which airlines provide for employees and retirees no-additional-cost travel benefits have concluded that such programs are not pension plans within the meaning of ERISA because the benefits are not retirement income.  *Preuc v. Continental Micronesia, Inc.*, 1997 WL 538933 (D. Guam 1997); *Prince v. American Airlines, Inc.*, 1999 WL 796178 (S.D.N.Y. 1999); *Constantine v. Am. Airlines Pension Benefit Plan*, 162 F. Supp. 2d 552, 556 (N.D. Tex. 2001).  Travel benefits provided by airlines are analogous to telephone benefits conceded by telecommunications companies.

Additionally, as the *Preuc* court explained, in reasoning equally applicable to this case, "Because the right to free travel pass benefits do (sic) not require the employer to pay money into a separate fund, such benefits do not constitute an ERISA plan."  *Preuc*, 1997 WL 538933 at *3.  The *Preuc* court cited *California Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997) and *Massachusetts v. Morash*, 490 U.S.

107, 109 S. Ct. 1668, 104 L. Ed. 2d 98 (1989) for the proposition that an employee benefit

funded out of the employer's general assets and not through a separate fund is not an employee

benefit plan within the meaning of ERISA.  Though that perhaps overstates the holdings of

*Dillingham* and *Morash*, those decisions at least stand for the principle that "[b]enefits paid out of

an employer's general assets present[] risks indistinguishable from 'the danger of defeated

expectations of wages for services performed,' a hazard with which ERISA is unconcerned."

*Dillingham*, 519 U.S. at 327 (*quoting Morash*, 490 U.S. at 115).

Thus, the Court in *Dillingham* held that an unfunded apprenticeship program is not

covered by ERISA.  *Dillingham*, 519 U.S. at 327.  And in *Morash* the Court held that ERISA did

not extend to a company's policy of paying its discharged employees for their unused vacation

time.  *Morash*, 490 U.S. at 115.  The *Morash* Court noted, "ERISA was passed by Congress in

1974 to safeguard employees from the abuse and mismanagement of funds that had been

accumulated to finance various types of employee benefits."  *Id*. at 112.  It went on to distinguish

"funds accumulated to finance employee benefits," the mismanagement of which ERISA was

designed to prevent, from "payments by a single employer out of its general assets," which do not

implicate ERISA.  *Id*. at 115, 120.

Qwest's Program bears the hallmarks of programs which Congress chose not to regulate

in ERISA.  The telephone concession, like the travel benefits at issue in *Preuc* and the vacation

benefits in *Morash*, presents a risk of defeated expectations indistinguishable from the risk of

wages expected but not paid.  ERISA is indurate to that hazard, which it leaves to the states to

regulate.  *Dillingham*, 519 U.S. at 327; *Morash*, 490 U.S. at 115.

Ms. Rathbun suggests incorporating the definition given to the term "income" in the

Internal Revenue Code; because the reimbursements were taxable to employees and retirees, she argues, they constituted retirement income under ERISA.  However, as a proxy for ERISA retirement income, the concept of taxable income is both over- and under-inclusive.  It sweeps too broadly because it includes income not paid on account of retirement.  Here, for example, active employees received taxable reimbursements.  It reaches not far enough because not all amounts paid to retirees are taxable – reimbursements to pre-divestiture AT&T retirees present an example.  In short, though pension distributions generally constitute taxable income, taxable benefit payments do not necessarily constitute retirement income.

Next, citing *Musmeci v. Schwegmann Giant Super Mkts., Inc.*, 332 F.3d 339 (5th Cir. 2003), *cert. denied*, 540 U.S. 1110, 124 S. Ct. 1078, 157 L. Ed. 2d 898 (2004), Ms. Rathbun argues that I should adopt the "ordinary" definition of income, by which she contemplates the meaning ascribed to the term in connection with employment: money or its equivalent received in exchange for labor or services.  She does not suggest how ERISA's inclusion of the modifier "retirement" favors her view.

In *Schwegmann*, the Fifth Circuit considered a program by which a grocery store chain disbursed to its former long-term employees, upon their retirement and monthly thereafter, vouchers for the purchase of groceries.  To qualify for the vouchers, retirees had to have worked for the company for twenty years, reached the age of sixty, and have been employed in a supervisory position for at least one year at the time of retirement.  The vouchers amounted to $216 monthly and did not correspond to any actual purchases by the retirees.  Valid for thirty days, the vouchers were intended for in-kind purchases but often were exchanged, at least in part, for cash.  Employing the definition of income used in the Internal Revenue Code, the court

18

determined that the vouchers constituted retirement income and that the program therefore was governed by ERISA. *Schwegmann*, 332 F.3d at 345. The court found significant that the cash value of the vouchers was discernable from the face of the instruments.

*Schwegmann* is inapplicable here on three grounds. First, for the reasons explained above, adopting the Internal Revenue Code's definition of income in this case would render the term "retirement income" nonsensical. Thus, to the extent that the *Schwegmann* court held that the Internal Revenue Code and ERISA use common terms, I find that holding unpersuasive.

Second, unlike the retirees in *Schwegmann*, beneficiaries of Qwest's Program receive the concession only by first consuming telecommunications services. Those employees and retirees who before January 1, 2004 received reimbursements for comparable services provided by competitors were required to demonstrate their expenditures by the submission of a signed statement. Program concessions were not negotiable for goods or services that Qwest did not sell and were issued in no set monthly amount.

Third, even if the *Schwegmann* court's definition of income could provide guidance in this case, Program concessions do not constitute *retirement* income for purposes of 29 U.S.C. § 1002(2)(A). Unlike the vouchers at issue in *Schwegmann*, Program discounts and reimbursements are conceded on account of employment and, though they continue into retirement for some, are administered by the OTC in the same manner before and after retirement.

Ms. Rathbun's history with the Program is illustrative. Between 1970 and 2000, she received a fifty percent reimbursement on her local (and, later, intraLATA) telephone expenses. Upon her attainment of thirty years with Qwest and its predecessors, her reimbursement increased to one hundred percent. At no time during this period could her reimbursement be said to

constitute retirement income; she was not then retired.  The reimbursement continued unchanged after her retirement on June 6, 2001 until Qwest amended the Program in December, 2003.

Ms. Rathbun points out that Qwest administered the Program in connection with pension, Medicare, and other retirement benefits.  However, one could expect Qwest to do so for administrative convenience.  Similarly, that Qwest tied eligibility for post-retirement telephone benefits to participation in a pension plan indicates not that the Program itself was a pension plan but rather that eligibility for pensions served as a useful surrogate for eligibility for the concession.

Ms. Rathbun cites *Stoffels v. SBC Communs., Inc.*, 430 F. Supp. 2d 642 (W.D. Tex. 2006), in which the district court denied a motion to dismiss premised upon the defendant's argument that the program there at issue was not an ERISA plan.  Ms. Rathbun misconstrues the holding of that case because she disregards the procedural posture it assumed at the time of decision.  The judge there was obliged to accept as true the plaintiffs' allegations that: 1) the telephone concession was effective only after retirement, and 2) the employer made reimbursements to retirees in set amounts, "without presentation of a phone bill, and regardless of whether the recipient had incurred any charges on any telephone bill."  *Id*. at 652, 653.  By contrast, the undisputed facts in this case, before me on cross motions for summary judgment, are that the Program covered occupational employees, retirees of various seniority, former directors, and active and retired management employees and that reimbursements were made only for actual expenditures on telephone service.

Finally, Ms. Rathbun argues that the Program is an ERISA plan because one can discern its intended benefits, the class of beneficiaries, the source of financing, and the procedures for benefit disbursement.  *See Peckham v. Gem State Mut.*, 964 F.2d 1043, 1047 (10th Cir. 1992);

*Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982).  However, whether the Program constitutes a plan is a different question than whether it constitutes one or both of the discrete types of plans identified in 29 U.S.C. § 1002(3).  As demonstrated above, it does not.

Accordingly it is ORDERED that:

1) Ms. Rathbun's motion to certify a class is DENIED;

2) Ms. Rathbun's motion for partial summary judgment is DENIED;

3) Qwest's motion for summary judgment on the ground that the concession Program is not an ERISA plan is GRANTED; and

4) judgment shall enter in Qwest's favor on all claims, with costs.

Dated: October   18  , 2006, in Denver, Colorado.

BY THE COURT:

    s/Lewis T. Babcock
Lewis T. Babcock, Chief Judge